**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 21-01190 (CGM) |
| v. | |
| THE HEBREW UNIVERSITY OF JERUSALEM, YISSUM RESEARCH DEVELOPMENT COMPANY OF THE HEBREW UNIVERSITY OF JERUSALEM LTD., BEN-GURION UNIVERSITY OF THE NEGEV, B.G. NEGEV TECHNOLOGIES AND APPLICATIONS LTD., THE WEIZMANN INSTITUTE OF SCIENCE, and BAR ILAN UNIVERSITY, | |
| Defendants. | |

**MEMORANDUM DECISION GRANTING DEFENDANTS'
MOTION TO DISMISS**

<u>**A P P E A R A N C E S**</u>:

<u>**COUNSEL:**</u>

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY
By:    Tracy L. Cole
       Fernando A. Bohorquez, Jr.
       Keith R. Murphy
       Ganesh Krishna
       Michelle N. Tanney

*Attorneys for Defendants*
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
By:    Emil A. Kleinhaus
       Michael H. Cassel


**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

The Hebrew University of Jerusalem, Yissum Research Development Company of The

Hebrew University of Jerusalem Ltd. ("Yissum," and together with The Hebrew University of

Jerusalem, "Hebrew University"), Ben-Gurion University of the Negev ("Ben Gurion"), B.G.

Negev Technologies and Applications Ltd. ("B.G. Negev," and together with Ben-Gurion

University of the Negev, "BGU"), Weizmann Institute of Science ("Weizmann"), and Bar Ilan

University ("Bar Ilan,") (collectively, the "Defendants"), motion to dismiss the complaint of

Irving Picard, the trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS") seeking to recover subsequent transfers allegedly consisting of

BLMIS customer property.  Defendants seeks dismissal for lack of personal jurisdiction and for

failure to state a claim for which relief can be granted.  Defendants argue that the complaint fails

to adequately plead minimum contacts, that any exercise of jurisdiction over the Defendants would be unreasonable, and that the complaint fails to state a claim by failing to show that the initial transfers were avoided.  For the reasons set forth herein, the motion to dismiss is granted.

## Jurisdiction

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  This Court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated January 31, 2012.  In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see* Order, Civ. 08–01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision.  Personal jurisdiction has been contested by the Defendants.

## Background

The Court assumes familiarity with the background of the BLMIS Ponzi scheme and its SIPA proceeding.  *See Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 178–83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on September 27, 2021.  (Compl., ECF[1] No. 1) (the
"Complaint").  Via the Complaint, the Trustee seeks to recover approximately $49.7 million of
BLMIS customer property that the Defendants allegedly received from transfers from the
Yeshaya Horowitz Association ("YHA") BLMIS Account.  (*Id.* ¶¶ 8–9).

YHA was a BLMIS account holder, founded for the purpose of providing funding to
institutions like the Defendants.  (*Id.* ¶¶ 2–3).  YHA was a registered Israeli non-profit
association that held an account with BLMIS in New York and bank accounts in Israel.  (*Id.* ¶¶
2–3, 19).  YHA's account was funded by transfers of BLMIS customer property from two
accounts held by Magnify, Inc. ("Magnify").  (*Id.* ¶¶ 3, 12).  Magnify was a shell company, into
which Bernard Madoff transferred fictitious profits.  (*Id.* ¶ 10).  The Transfers from Magnify's
BLMIS account to YHA's were made "internally . . . at BLMIS on paper."  (*Id.* ¶ 12).
Defendants then allegedly, via agents, "solicited, facilitated, and received funding" in the form of
grants from YHA.  (*Id.* ¶ 3).  In this way, YHA acted "as a vehicle to funnel funds from the New
York-based BLMIS and the YHA BLMIS Account to Israeli institutions" like Defendants.  (*Id.* ¶
39).

The Trustee filed an adversary proceeding in 2010 against Magnify to avoid and recover
the initial fraudulent transfers from BLMIS to Magnify, YHA, and others.  (*Id.* ¶ 4); *see Picard
v. Magnify, Inc. et al.*, Adv. Pro. No. 10-05279 (SMB) (Bankr. S.D.N.Y. 2017) (the "Magnify
Action").  In 2017, the Trustee settled with the Magnify, YHA, and others, who consented to
judgment for the full amount of transfers.  (Magnify Action, Settlements, ECF Nos. 197–202).
$126,489,846 of transfers made to YHA were avoided.  (Magnify Action, Consent J., ECF No.
199).

---

[1] Unless otherwise indicated, all references to "ECF" are references to this Court's electronic docket in adversary
proceeding 21-01190-cgm.

YHA never deposited any money into the YHA BLMIS Account or into any other account with BLMIS. (Compl. ¶ 20). The YHA account was entirely funded with transfers from the Magnify BLMIS accounts. (*Id.* ¶ 9). YHA subsequently transferred to the Defendants approximately $120 million over the twenty years that YHA's account at BLMIS was active. (Compl. ¶ 7). The Trustee seeks to recover approximately $49.7 million subsequently transferred to the Defendants during the six years preceding Madoff's arrest in December 2008. (*Id.* ¶ 8).

The Defendants are alleged to have participated in and benefitted from the Magnify-YHA scheme. (*Id.* ¶ 21). Defendants' purported agents served as members of YHA, requested millions of dollars in grants from YHA on behalf of the Defendants, and approved those same grants for the benefit of the Defendants. (*Id.*).

Customer property was transferred from the Magnify BLMIS Account to the YHA BLMIS Account by Yair Green, an Israeli attorney, who served as legal counsel to YHA and managed the Magnify BLMIS Account. (*Id.* ¶¶ 11, 14, 19). In addition to serving in these roles, Green was on the Board of Governors of the Hebrew University, the Weizmann Institute, and BGU. (*Id.* ¶ 15). He also served on BGU's Investment Committee board, Executive Committee board, and Board of Governors. (*Id.*). Green met personally with Bernard Madoff in New York to finalize "portfolio evaluations" in lieu of monthly customer statements. (*Id.* ¶ 17). BLMIS provided no monthly customer statements to Green because of Madoff's and Green's "shared knowledge that no BLMIS securities trading was funding the Magnify BLMIS Accounts." (*Id.* ¶ 18).

In 2015, the Trustee filed suit in Israel against the Defendants to recover transfers of BLMIS customer property they received through YHA. (Mem. L. 1, ECF No. 17); (Opp'n 6,

ECF No. 36); (Bohoquez Decl. Ex. 1, Stmt. of Claim, ECF No. 37); District Court of Tel Aviv –

Jaffa, CivC (DC TA) 18909-12-15 Picard v. The Hebrew University of Jerusalem, et al. (Dec. 9,

2015) (Isr.).  In that action, the Trustee seeks a judgment pursuant to Israeli Unjustified

Enrichment Law, 5739-1979, as the successor-in-interest to BLMIS.  (Bohoquez Decl. Ex. 1,

Stmt. of Claim); (Opp'n 51).  The Israeli action continues, undisturbed by this proceeding.

(Mem. L. 39, ECF No. 17) ("The Trustee has been litigating intensely in Israel for six years. The

Trustee has taken broad discovery in Israel, and all parties have made extensive submissions to

the Israeli court."); (Opp'n 52–53).

<u>The Hebrew University</u>

The Hebrew University of Jerusalem is an academic and research institution in the State

of Israel.  (Compl. ¶ 31).  The Hebrew University of Jerusalem conducts its commercial

endeavors through Yissum, its wholly-owned and controlled subsidiary.  (*Id.* ¶ 32).  The Hebrew

University of Jerusalem and Yissum share a number of directors, officers, business operations,

and office space.  (*Id.* ¶ 33).  The Trustee alleges that Yissum is a mere instrumentality of and

acts as an agent of the Hebrew University of Jerusalem.  (*Id.* ¶ 34–35).  They are alter-egos.  (*Id.*

¶ 35).  The Hebrew University received funds from YHA.  (*Id.*).

Agents of the Hebrew University are alleged to have created and run YHA.  (*Id.* ¶ 37).

These alleged agents include: Itzhak Amir, who was Hebrew University's head asset manager

and served as YHA'a chairman and managing director; Amnon Pazi, who was Hebrew

University's President; and Henri Atlan, who served as YHA's chair and was a professor at a

university hospital affiliated with the Hebrew University's School of Medicine.  (*Id.* ¶¶ 13, 37–

38).  Amit and Atlan had signatory authority for the YHA BLMIS Account and YHA's and

Magnify's bank accounts in Israel.  (*Id.* ¶ 38).  Hanoch Gutfreund, a non-founding member of

YHA, served on the YHA managing board, was a signatory to YHA's Israeli bank accounts, and was a rector, president, and professor of the Hebrew University.  (*Id.* ¶¶ 15, 37–38).  Ilan Chet, who served as the Hebrew University's vice president of research and development authority, is alleged to have solicited grants from YHA.  (*Id.* ¶¶ 38, 202–10).

Bar Ilan

Bar Ilan University is an academic and research institution in the State of Israel. (*Id.* ¶ 51).  Bar Ilan received approximately $10 million of subsequent transfers from YHA with $8,787,114 received during the period applicable to this action.  (*Id.* ¶ 52).  Amnon Caspi, a professor at Bar Ilan and a member of YHA since 1995, solicited funds from YHA on behalf of Bar Ilan.  (*Id.* ¶¶ 53–54).  As a member of YHA, Caspi voted on grant distributions and reviewed and approved YHA financial statements.  (*Id.* ¶ 54).  Caspi would request funds by presenting grant requests to YHA.  (*Id.*).  YHA would transfer funds for these grants from the YHA BLMIS accounts to YHA's Israeli bank accounts and then on to Bar Ilan.  (*Id.* ¶ 55).  Bar Ilan accepted the benefit of each subsequent transfer.  (*Id.* ¶ 58).

Weizmann

The Weizmann Institute of Science is an academic and research institution in the State of Israel. (*Id.* ¶ 59).  During the applicable period, Weizmann received $6,148,927 of subsequent transfers from the YHA BLMIS account in New York.  (*Id.* ¶ 60).  Irun Cohen was a professor and/or administrator at Weizmann who joined YHA in 1996.  (*Id.* ¶¶ 61–62).  As a member of YHA, Cohen solicited and accepted YHA funds on behalf of Weizmann through an entity called the Center for the Study of Emerging Diseases, of which Cohen served as director.  (*Id.*).  Cohen requested funds from YHA and distributed those funds through the center by voting on grant distributions and reviewing and approving YHA financial statements.  (*Id.*).  YHA would

transfer funds for these grants from YHA BLMIS accounts to YHA's Israeli bank accounts. (*Id.* ¶ 63). Since 2004, Shimon Ullman, a professor at Weizmann and member of YHA, solicited, voted on, and approved grants from YHA. (*Id.* ¶ 65). In 2007, Green was appointed to Weizmann's Board of Governors. (*Id.* ¶ 66). Green communicated regularly with Bernard Madoff and BLMIS employees and made personal visits to BLMIS headquarters in New York to secure funds for Weizmann and others. (*Id.* ¶ 67). Weizmann accepted the benefit of each subsequent transfer. (*Id.* ¶ 69).

BGU

The Ben-Gurion University of the Negev and B.G. Negev Technologies and Applications Ltd. (collectively, "BGU") are academic and research institutions in the State of Israel. (*Id.* ¶ 70). The Trustee seeks to recover $16,866,170 of subsequent transfers from BGU. (*Id.* ¶ 75).

Ben-Gurion and B.G. Negev shared directors, officers, and personnel, and B.G. Negev's officers are appointed by Ben-Gurion. (*Id.* ¶ 71). Ben-Gurion exercised complete control over B.G. Negev's business. (*Id.*). B.G. Negev is alleged to act as an agent for and solely on behalf of Ben-Gurion. (*Id.* ¶ 72). The revenues of B.G. Negev are considered to be the revenues of Ben-Gurion, and B.G. Negev has no assets aside from those shared with Ben-Gurion. (*Id.*). B.G. Negev is a mere instrumentality of Ben-Gurion and the two act as alter egos of each other. (*Id.* ¶ 73).

Bracha Rager, a professor at BGU, was a member of YHA since 2005, a member of YHA's Center for the Study of Emerging Diseases since 1997, and the coordinator and director of YHA's Israel Vaccine Research Institute. (*Id.* ¶ 76, 78). Rager requested funds from YHA, and as a member of YHA, he reviewed and approved its annual financial statements. (*Id.* ¶ 78). Members of YHA, including Rager, requested transfers of funds from YHA BLMIS account to

YHA's Israeli bank accounts.  (*Id.* ¶ 78).  Cohen, a member of YHA, served as Director of the

National Center for Biotechnology in the Negev at BGU from 2004 to 2006 while soliciting

funds or grants for BGU on its behalf.  (*Id.* ¶ 79).  In 2002, Green was appointed to the Board of

Governors of BGU and was responsible for fundraising and financial decisions of BGU.  (*Id.* ¶¶

81–82).  Green communicated regularly with Bernard Madoff and BLMIS employees and made

personal visits to BLMIS headquarters in New York to secure funds.  (*Id.* ¶ 83).  BGU accepted

the benefit of each subsequent transfer.  (*Id.* ¶ 85).

      In their motion to dismiss, Defendants argue that this Court should dismiss the Complaint

for lack of jurisdiction and for failure to state a claim under §550.  The Trustee opposes the

motion to dismiss.  The Court heard oral arguments on the motion on December 21, 2022.

**Discussion**

**Personal Jurisdiction**

      Defendants object to the Trustee's assertion of personal jurisdiction.  In the Complaint,

the Trustee argues that Defendants purposefully availed themselves of the laws of the United

States and New York through individuals who acted as their agents.  *(Id.* ¶ 30).

      To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2)

of the Federal Rules of Civil Procedure, the Trustee "must make a prima facie showing that

jurisdiction exists."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has

considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).  "'It may

determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the

motion; or it may conduct an evidentiary hearing on the merits of the motion.'"  *Id.* (quoting

*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *see also Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018) (same).

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin.*, 722 F.3d at 84–85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 (Bankr. S.D.N.Y. 2021) (same). At the pre-discovery stage, the allegations need not be factually supported. *See Dorchester Fin.*, 722 F.3d at 85 (an averment of facts is necessary only after discovery).

In order to be subjected to personal jurisdiction in the United States, due process requires that a defendant have sufficient minimum contacts with the forum in which defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501 (Bankr. S.D.N.Y. 2012), (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The pleadings and affidavits are to be construed "'in the light most favorable to the plaintiffs, resolving all doubts in their favor.'" *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *BNP Paribas S.A.*, 594 B.R. at 187.

> The Supreme Court has set out three conditions for the exercise of specific jurisdiction over a nonresident defendant. First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up).

**Purposeful Availment**

"[M]inimum contacts . . . exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). "Although a defendant's contacts with the forum state may be intertwined with its transactions or interactions with the plaintiff or other parties, a defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction." *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (cleaned up). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

The Complaint focuses on the contacts of alleged agents of the Defendants with New York. The Complaint alleges that the Defendants' agents created and operated YHA solely for the purpose of transferring New York-based BLMIS customer property for distribution to the Defendants. (Compl. ¶¶ 21, 30). Yair Green, the most prominent of the supposed agents, met with Bernard Madoff personally in New York to finalize evaluations of Magnify BLMIS accounts. (*Id.* ¶ 17). From 1995 to 2008, he made yearly trips to New York to discuss Magnify and YHA accounts with Madoff personally. (*Id.* ¶ 46). Green directed internal BLMIS account transfers to the YHA Account in New York and from this account to YHA's accounts in Israel, from which they were then transferred to the Defendants. (*Id.* ¶ 19). He made grant requests on behalf of the Defendants Hebrew University and Weizmann. (*Id.* ¶¶ 45, 67). Amir and Atlan, employees of the Hebrew University, were founding members of YHA. (*Id.* ¶¶ 172, 180). They requested BLMIS transfers from the YHA BLMIS account to YHA's Israeli accounts for the Hebrew University. (*Id.* ¶ 41). Atlan personally signed letters to BLMIS to effectuate transfers from the New York YHA BLMIS accounts to the Israel YHA accounts. (*Id.* ¶ 181). Gutfreund

solicited grants from YHA on behalf of Hebrew University while a member of the former's managing board and a professor or president of the latter. (*Id.* ¶ 185–86). Gutfreund met with Bernard Madoff at BLMIS's office in New York, where he received a tour of the trading room during a fund raising trip to New York on behalf of the Hebrew University. (*Id.* ¶ 43). Ilan Chet, a vice president of the Hebrew University, actively solicited funds or grants on behalf of and for the benefit of Hebrew University and, as a member of YHA, approved its annual financial statements which acknowledged that YHA funds were sourced with a broker in the United States. (*Id.* ¶¶ 203, 206).

Caspi, a member of YHA and employee of Bar Ilan, solicited funds for Bar Ilan and reviewed and approved YHA's annual financial statements that acknowledged that 99.6% of YHA's total funds "are traded on the United States Stock Exchange through a local broker." (*Id.* ¶¶ 55, 284–88). Cohen and Ullman, both Weizmann professors, requested and approved funds in the form of grants from YHA for the benefit of Weizmann as YHA members. (*Id.* ¶¶ 65, 68). Rager, a BGU professor and YHA member, simultaneously solicited, approved, and received grants for BGU from YHA. (*Id.* ¶¶ 226–27).

Imputation of Agents Actions

Defendants argue that the allegations concerning Defendants's purported agents should not be imputed to the Defendants. Defendants argue that the complaint lacks allegations that the purported agents participated in YHA's funding activities at the behest of any Defendant. (Mem. L. 12, ECF No. 17). Defendants argue that while the Complaint alleges that Green sat as a board member on the board of governors of each of the Defendants, "serving on the board or other governing body of an organization does not make one an agent of the organization." (*Id.*).

Defendants suggest that the Complaint shows at most that the individuals acted in their personal or private capacities.  (*Id.* at 16).

Defendants further argue that Israeli law should control whether the Court finds an agency relationship.  (*Id.*).  At the December 21, 2022 hearing, Defendants clarified that there is no conflict between U.S. and Israeli law and that the latter should apply only if the Court finds that U.S. law supports imputation of agency.  (Hr'g Tr. 49:12–17, December 21, 2022) ("Now, because we think that both bodies of law lead to the same conclusion, we don't believe there's a conflict here. But if a court were to conclude at some point that U.S. law supports imputation, we think then that a choice of law analysis would be required, and the court would have to determine whether to apply Israeli law.").

Federal Rule of Civil Procedure 44.1, made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 9017, governs determinations of foreign law in federal court.  It states:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1.  Rule 44.1 permits courts to conduct their own independent research to determine foreign law "but imposes no duty upon them to do so."  *Baker v. Booz Allen Hamilton, Inc.*, 358 F. App'x 476, 481 (4th Cir. 2009).  "Thus, the party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the . . . court to apply it in a particular case."  *Bigio v. Coca-Cola Co.*, No. 97 Civ. 2858 (BSJ), 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23,  2010) (quoting *Baker*, 358 F. App'x at 481).

Where there is no conflict between a forum's law and foreign law, a court normally applies the law of the forum. *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 557 (Bankr. S.D.N.Y. 2021). "This is true especially where the parties have not demonstrated that the elements of the claim differ under the foreign law." *Id.* (citing *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 573 n.7 (S.D.N.Y. 2018)). "An actual conflict arises where the law of each jurisdiction provides different substantive rules, and the differences are relevant and have a significant possible effect on the outcome of the trial, although they need not lead to different outcomes." *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (cleaned up). Where the party fails to "demonstrate an actual conflict between New York and another [jurisdiction's] laws, no choice of law analysis need be undertaken." *E. Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.*, 2:17-cv-01034 (ADS)(AYS), 2017 WL 4162309, at *4 (E.D.N.Y. Sept. 19, 2017) (quoting *Park Place Entm't Corp. v. Transcon. Ins. Co.*, 225 F. Supp. 2d 406, 408–09 (S.D.N.Y. 2002)).

The Defendant has stated that Israeli and U.S. law are not in conflict. (Mem. L. 13, ECF No. 17) ("In addition, as Professor Amir Licht — a leading expert on Israeli corporate law — has testified, Israeli law (like U.S. law) does not treat individual board members or members of other governing bodies as 'organs' of a university absent specific authority from their institutions to take particular actions."); (*Id.* at 20) ("Under both Israeli and U.S. law, there is no basis to conclude, absent evidence of a particular appointment, that professors are agents of their universities when they participate in outside organizations.").

The Trustee relies on the Third Restatement of Agency, for the proposition that an agency relationship may encompass "situations where the principal may exercise influence over an agent's actions, such as the imposition of incentive structures that 'reward the agent for

achieving results,' thereby affecting the agent's actions."  (Opp'n 28, ECF No. 36) (quoting

Restatement (Third) of Agency § 1.01, cmt. f)).

Determining whether individuals acted as agents of the Defendants "requires an analysis

of 'the realities of the relationship in question rather than the formalities of agency law.'"

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, No. 18 Civ. 8152 (JFK), 2021 WL

2000371, at *7 (S.D.N.Y. May 19, 2021) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v.*

*BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004)); *CutCo Indus., Inc. v. Naughton*,

806 F.2d 361, 366 (2d Cir. 1986)).  "To establish an agency relationship for purposes of personal

jurisdiction, a plaintiff must show that the alleged agent acts for the benefit of, and with the

knowledge and consent of, the non-resident principal, and over which that principal exercises

some control."  *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318–19

(S.D.N.Y. 2009) (cleaned up); *see also Hau Yin To*, 700 F. App'x at 68) (citing *CutCo Indus.*

806 F.2d at 366) ("It is not enough to allege that defendants had the legal ability to control the

alleged agent; plaintiffs seeking to establish jurisdiction under C.P.L.R. § 302(a)(2) must allege

the actual exercise of control, based on 'the realities of the relationship.'").

This control need not be direct.  *Wiwa v. Royal Dutch Petrol. Co.*, 226 F.3d 88, 95 (2d

Cir. 2000).  Merely alleging a business relationship between a defendant and purported agent is

insufficient when that relationship "begs the question of whether and how the alleged [principal]

exercised control over the activities of the alleged []agent."  *DISH Network LLC v. Kaczmarek*,

No. 19-CV-4803(EK)(SJB), 2021 WL 4485870, at *2 (E.D.N.Y. Sept. 30, 2021).  "[E]vidence of

cooperation" or of the parties' "long history" is not always evidence of control.  *Id.*

Parties have not demonstrated relevant substantive differences between U.S. and Israeli

law on this issue.  Under both U.S. and Israel law, the question of imputation of the alleged

agents turns less on the formal status of an agent than on the principal's actual exercise of control. The Court agrees with the Defendants and sees no differences in relevant substantive rules that would have a signifant effect concerning the imputation of the supposed agents.

The Complaint alleges individuals acted as agents of the Defendants due to their dual roles at YHA and the Defendant institutions. (Compl. ¶¶ 13, 37–38). Defendants received huge financial benefits from the transfers from YHA. (*Id.* ¶ 49) ("Hebrew University was among the largest recipients of grants and funding from YHA. From YHA's creation in 1988 to 2008, Hebrew University received approximately $34.1 million from YHA."); (*id.* ¶ 56) ("Bar Ilan, through Caspi, solicited funds from BLMIS, which flowed through the YHA BLMIS Account, for grants. In doing so, Bar Ilan participated in the furtherance of the Magnify Scheme and is subject to personal jurisdiction in this Court through the acts of its agent, Caspi."); (*id.* ¶ 67) ("Through its agents, Weizmann solicited funds from BLMIS, which flowed through the YHA BLMIS Account, for grants."); (*id.* ¶ 75) ("From YHA's creation in 1988 to 2008, [Ben Gurion] received approximately $18.16 million from the YHA BLMIS Account, the vast majority in U.S. dollars."). The Complaint demonstrates the overlapping employment and of these individuals and a reason for them to self-interestedly approve the grants; the Complaint fails to show any actual control by Defendants over these agents at the time of the relevant actions.

The Complaint details how YHA concealed the source of the funds from the Israel authorities. (*Id.* ¶ 138–54). These allegations also demonstrate how unlikely it was that the Defendants had knowledge of and consented to the transfers.

The Trustee has not been able to connect the supposed 'incentive structure' to any control over a purported agent. (Opp'n 39–40, ECF No. 36) ("Green's appointment to [Defendants'] Boards of Governors was both reward and incentive for Green to transfer tens of millions of

dollars to these Defendants."); (Hr'g Tr. 68:21–25, December 21, 2022).  ("But the precise

contours of the incentive structures that would be in place with respect to the work that they do at

these institutions is really a fact-based question that we would need to develop further in the

course of discovery.").  In truth, nothing that can be called a 'structure' was alleged.

The Trustee argues that the Defendants ratified the agency relationship after the agents

acted on their behalf. (Compl. ¶¶ 178, 193, 201, 209, 215) (alleging that Hebrew University

ratified the actions of Atlan, Amir, Gutfreund, Green, and Chet by accepting the funds);  (*Id.* ¶¶

228, 237, 245, 250) (alleging that BGU ratified the actions of Rager and, Cohen, and Green by

accepting the funds); (*Id.* ¶¶ 264, 270, 277, 283) (alleging that Weizmann ratified the actions of

Cohen, Ullman, and Green by accepting the funds); (*Id.* ¶ 296) (alleging that Bar Ilan ratified the

actions of Caspi by accepting the funds).

"Ratification is a form of retroactive activity that occurs when the principal, having

knowledge of the material facts, accepts the benefits of the agent's action already made on his

behalf."  *Haua v. Prodigy Network, LLC*, 20 Civ. 2318 (PGG) (KNF), 2021 WL 4478737, at *5

(S.D.N.Y. Sept. 29, 2021).  Ratification may establish an agency relationship in the absence of

actual or apparent authority if the principal,

> affirms or ratifies an act done by one who purports to be acting for the ratifier.
> Under New York law, it is possible to imply ratification if the principal retains the
> benefit of an unauthorized transaction with knowledge of the material facts. Thus,
> ratification is a form of retroactive activity that occurs when the principal, having
> knowledge of the material facts, accepts the benefits of the agent's action already
> made on his behalf.

*Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 318 (S.D.N.Y. 2006).  "Key to the concept

of ratification is intent, express or implied, to affirm or adopt the acts of another."  *Precedo Cap.*

*Grp. Inc. v. Twitter Inc.*, 33 F. Supp. 3d 245, 254 (S.D.N.Y. 2014) (citation omitted).

The Defendants received funds in US dollars from YHA, which "[i]nstead of truthfully disclosing that the source of its funding was the Magnify BLMIS Accounts, . . . represented to the Israeli Registrar over a period of years that it could not disclose the donor's identity because the donor insisted on remaining anonymous." (*Id.* ¶ 148). YHA's obfuscation "remained the practice as late as 2007." (*Id.*). By concealing the source of its funding, YHA "precluded potential discovery of the Magnify BLMIS Accounts." (*Id.* ¶ 154). In other words, Defendants were not aware of the source of the transfers and, by accepting funds from YHA, did not ratify the actions of the purported agents.

The Complaint fails to show that Defendants purposefully availed themselves of the privileges of doing business with the forum. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). The allegations are legally insufficient to constitute a prima facie showing of jurisdiction. *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d. Cir. 2013).

**Arise out of or relate to the defendant's forum conduct**

As to the second prong, the suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, __ U.S. __, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, the court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts

within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Here, the Trustee is asserting subsequent transfer claims against Defendants for monies they received from YHA.  (Compl. ¶¶ 305–23).  These allegations are directly related to activities with YHA and BLMIS.  *See Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) (finding that the redemption and other payments defendants received as direct investors in a BLMIS feeder fund arose from the New York contacts such as sending subscription agreements to New York, wiring funds in U.S. dollars to New York, sending redemption requests to New York, and receiving redemption payments from a Bank of New York account in New York, and were the proximate cause of the injuries that the Trustee sought to redress).

The allegations of activities with YHA and BLMIS in New York affiliates this suit with alleged in-state conduct.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  The Complaint satisfies the second prong of the jurisdictional analysis.

**Reasonableness**

Notwithstanding the lack of sufficient minimum contacts present, the exercise of jurisdiction is unreasonable.  Where sufficient minimum contacts exist, the Court must determine if exercising personal jurisdiction over the Defendant is reasonable and "comport[s] with fair play and substantial justice."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotations omitted).  Factors the Court may consider include the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in

furthering fundamental substantive social policies. *Id.* at 477. Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477). "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568–69 (2d Cir. 1996)); *Peters v. BASF Metals Ltd.* (*In re Platinum & Palladium Antitrust Litig.*), 61 F.4th 242, 273 (2d Cir. 2023).

The Defendants argue that exercising personal jurisdiction would be unreasonable, as "the defendants are being asked to defend this suit some 5700 miles from home," the Trustee "brought suit, six years ago, in a different forum (Israel) seeking the same recovery and more," relief can be obtained in the Israeli action, the suit can be most efficiently conducted in Israel due to the presence of defendants and witnesses, and bringing suit in the United States "harms Israel's own sovereign interest in adjudicating disputes arising out of its domestic transfers." (Mem. L. 29–30, ECF No. 17).

Defendants are represented by U.S. counsel and have filed suit in the United States in prior years in geographically more distant districts. *See, e.g., Hebrew Univ. of Jerusalem v. Gen. Motors LLC*, No. CV-10-3790-AB (JCX), 2015 WL 9653154, at *1 (C.D. Cal. Jan. 12, 2015).

The forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court. *Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *Picard v. Chais (In re*

*BLMIS)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010); *Picard v. Cohmad Sec. Corp. (In re*

*BLMIS)*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009); *Picard v. Fairfield Greenwich Grp., (In re*

*Fairfield Sentry Ltd.*), 627 B.R. 546, 568 (Bankr. S.D.N.Y. 2021); *see also In re Picard*, 917

F.3d 85, 103 (2d Cir. 2019) ("The United States has a compelling interest in allowing domestic

estates to recover fraudulently transferred property.").

Whether the forum and the Trustee have a strong interest in litigating *this* proceeding is

less clear. The Trustee has a cause of action regarding the transfers and possible remedy in Israel

already underway. In the Israeli action, the Trustee has already brought claims as a successor-in-

interest to BLMIS under Israeli Unjust Enrichment Law, alleging that Defendants were enriched

by receiving money that consisted of fictitious profit from the BLMIS Ponzi scheme. (Opp'n 6–

7, ECF No. 36). That case has pended for over six years and has advanced to discovery. (*Id.* at

7).

Proceeding with litigation here is unlikely to be an efficient resolution of the

controversies with the Israeli suit already six years pending. Fruthermore, as noted by the

Defendants, all relevant witnesses and evidence are located in Israel. (Hr'g Tr. 52:17–22,

December 21, 2022) ("[W]e have this long-running suit that's been going on in Israel, and a

complete concentration of the relevant witnesses and evidence in another forum where this case

can be -- or the claims -- the requests for recovery can separately be adjudicated.").

As already stated, the Trustee has failed to show minimum contacts supporting personal

jurisdiction. Even if the Court were to allow the imputation of the actions of the purported

agents to the Defendants, the attenuated and weak contacts between New York and the

Defendants would demand a strong showing of reasonableness. That showing is not present

here. The Trustee has not made a prima facie showing of personal jurisdiction with respect to the subsequent transfers at issue in this Complaint.

Although the Complaint fails to show personal jurisdiction and must be dismissed, the Court wishes to address the Defendants' arguments concerning recovery of subsequent transfers under § 550.

**12(b)(6) standard**

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pl[ed] complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007).  A complaint is "deemed to include any written instrument attached to it as an exhibit[,] .

. . documents incorporated in it by reference[,]" and other documents "integral" to the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted).  A

document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous

information and relied on it in framing the complaint.  *DeLuca v. AccessIT Grp., Inc.*, 695 F.

Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

**Recovery of Subsequent Transfers**

The Trustee is seeking to recover subsequent transfers made to Defendants by YHA

"under Bankruptcy Code § 550(a) and applicable provisions of SIPA, including § 78fff-2(c)(3)."

(Compl. ¶¶ 307, 310, 313, 316, 319, 322).

Pursuant to § 550(a) of the Bankruptcy Code, a trustee is entitled to recover avoided

transfers of customer property from initial transferees as well as from "any immediate or mediate

transferee of such initial transferee."  11 U.S.C. § 550(a).  "To plead a subsequent transfer claim,

the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent

transferee of that initial transferee, that is, that the funds at issue originated with the debtor."

*Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018); *see also*

*SIPC v. BLMIS (In re Consol. Proc. On 11 U.S.C. § 546(e))*, No. 12 MC 115, 2013 WL

1609154, at \*7 (S.D.N.Y. Apr. 15, 2013).  "Federal Civil Rule 9(b) governs the portion of a

claim to avoid an initial intentional fraudulent transfer and Rule 8(a) governs the portion of a

claim to recover the subsequent transfer."  *BNP Paribas*, 594 B.R. at 195 (*citing Sharp Int'l*

*Corp. v. State St. Bank & Trust Co., (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005).

The Trustee only needs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's burden at the pleading stage does not require exact accounting of the funds at issue. *BNP Paribas*, 594 B.R. at 195. Rather "[t]he plaintiff must allege the necessary vital statistics – the who, when, and how much – of the purported transfers to establish an entity as a subsequent transferee of the funds." *Id.* However, the plaintiff's burden at the pleading stage does not require dollar-for-dollar accounting of the exact funds at issue." *Id.*

Avoidability of the initial transfers

Defendants argue that the Trustee has failed to allege that the initial transfers were avoided, which they claim is required under § 550(a). (Mem. L. 31, ECF No. 17). The Defendants do not argue that the Complaint has alleged the avoidability of the initial transfers or that the funds he seeks to recover are subsequent transfers of those initial transfers. Defendants argue that prior avoidance is a "prerequisite to a recovery action." (*Id.* at 33).

While the Trustee must allege that the initial transfer is avoidable, he is not required to avoid the transfer received by the initial transferee before asserting an action against subsequent transferees. *IBT Int'l Inc. v. Northern (In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 706–07 (11th Cir. 2005) ("An interpretation of Section 550 mandating actual avoidance of initial transfers, conflates Chapter 11's avoidance and recovery sections."). The Trustee is free to pursue any of the immediate or mediate transferees, and nothing in the statute requires a different result. *Id.*

Defendants cite to a handful of cases that appear to support their interpretation. In *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171 (2d Cir. 2021), the Court of Appeals recites statutory language; it does not interpret it. Defendants quote *In re Picard*, 917 F.3d 85,95 (2d

Cir. 2019) to argue that "only once a transfer is avoided may a trustee recover the underlying property." Defendants ignore where the Court of Appeals later states "[w]e hold that, in recovery actions where a trustee alleges a debtor's transfers are avoidable as fraudulent under § 548(a)(1)(A), § 550(a) regulates the fraudulent transfer of property depleting the estate." *Id.* at 98.

Defendants then cite to *Geron v. Craig*, which states, "section 550 makes clear that a trustee may only recover transfers from subsequent transferees if the initial transfer itself 'is avoided.'" *Geron v. Craig* (*In re Direct Access Partners, LLC*), 602 B.R. 495, 518 (Bankr. S.D.N.Y. 2019) (citing *In re Picard*, 917 F.3d at 97 ). Had Defendants included the following sentences, the fuller context would have made clear that that the Trustee must only show that the initial transfers are avoidable:

> section 550 makes clear that a trustee may only recover transfers from subsequent transferees if the initial transfer itself "is avoided." *See* 11 U.S.C. § 550(a). Here, transfers made by DA Partners to DA Group prior to May 14, 2012 have not been and cannot be avoided by the Trustee, because those initial transfers represented distributions by DA Partners to its 99% limited liability company owner (DA Group) and because the New York Limited Liability Company Law imposes a three-year limit on any claim to avoid such transfers. If the Trustee has not avoided the initial transfers and cannot avoid them, then the Trustee cannot use section 550(a) to recover property from subsequent transferees.

*Id.*

Defendants also cite to *Harrah's Atl. City. Operating Co. v. Lamonica* (*In re JVJ Pharmacy, Inc.*), 630 B.R. 388, 401 (S.D.N.Y. 2021) for support, which states: "[b]ecause the Transfers must be avoided under section 548(a)(1) before the Trustee can invoke section 550 to seek recovery, *see Picard*, 917 F.3d at 98, the Court begins with the Bankruptcy Court's holding that the Debtor did not receive reasonably equivalent value for the Transfers." *Id.* Defendants

similarly cut off relevant parts of the District Court's analysis, which shows that the quoted text

focuses on the avoidability of the initial transfers, not on recovery under §550.  *Id.* at 400.

       Defendants again pick out isolated phrases from *Merit Management Group, LP v. FTI*

*Consulting, Inc.*, 138 S. Ct. 883, 889 (2018), in which the Court addresses what occurs "[i]f a

transfer is avoided."  Nowhere in this decision does the Court state the initial transfer must be

avoided.  Rather, the Court describes § 546(e) as allowing the defendant to "argue that the trustee

failed to properly identify an avoidable transfer under the Code," (*Id.* at 886) and later implies

that the trustee must only "properly identif[y] an avoidable transfer" to defend against certain

546(e) motions.  *Id.* at 894.

       Defendants acknowledge that *SIPC v. BLMIS* (*In re Consolidated Proceedings on 11*

*U.S.C. § 550(a)*), 501 B.R. 26 (S.D.N.Y. 2013), wherein Judge Rakoff states that "the Court

concludes that section 550(a)'s limitation on the Trustee's recovery of transfers 'to the extent that

a transfer is avoided' requires the Trustee to show that a given transfer is avoidable and does not

require an actual judgment of avoidance" is contrary to their interpretation.  (Mem L. 16–17,

ECF No. 17).  Defendants urge this Court to reconsider that decision, which was cited favorably

as recently as November 2022.  *See Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-

CV-06502 (JSR), 2022 WL 16647767, at *3 (S.D.N.Y. Nov. 3, 2022).  This Court cannot and

will not do so.

### Conclusion

For the foregoing reasons, the Defendants' motion to dismiss is granted.  The Defendants

shall submit a proposed order within fourteen days of the issuance of this decision, directly to

chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local

Bankruptcy Rule 9074-1(a).



/s/ Cecelia G. Morris

_____

**Dated: March 28, 2023**
**Poughkeepsie, New York**

**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**